### IN THE CIRCUIT COURT FOR ANNE ARUNDEL

| | |
|---|---|
| **WILLIAM REID HOUCK** **VANESSA SANDRA HOUCK** 1071 Westfield Drive Prince Fredrick, MD 20678 Plaintiffs, v. | Civil Case:  C-02-CV-24-000988 |
| **NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING** 1100 Virginia Drive, Suite 125 Fort Washington, PA 19034 SERVE ON: CSC-Lawyers Incorporating Service Company, Resident Agent 7 St. Paul Street, Suite 820 Baltimore, MD 21202 Defendants. | |

### COMPLAINT
### &
### REQUEST FOR JURY TRIAL

Plaintiffs William Reid Houck and Vanessa Sandra Houck (collectively the "Houcks" or "Plaintiffs"), by and through counsel, sue NewRez LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint" or "Defendant"), demand a trial by Jury on all counts for which a right to trial by jury is allowed and, in support of their Complaint, and state:

**PARTIES, JURISDICTION, AND VENUE**

1.  Plaintiffs William Reid Houck and Vanessa Sandra Houck are the owners of the real property and improvements located thereupon located at and commonly known as 1071 Westfield Drive, Prince Fredrick, MD 20678 (the "Houck Property").

2.  Plaintiffs are also the borrowers on the mortgage loan subject to this action which is associated with the Houck Property and was utilized entirely for personal, consumer purposes ("Houck Loan"). The Houck Loan is a federally related mortgage.

3.  Shellpoint is a wholly-owned subsidiary of Shellpoint Partners LLC, a Delaware limited liability company. Shellpoint Partners LLC is wholly-owned by NRM Acquisition LLC and NRM Acquisition II LLC, both of which are Delaware limited liability companies. Both NRM Acquisition entities are wholly-owned by New Residential Mortgage LLC, a Delaware limited liability company. New Residential Mortgage LLC is wholly-owned by New Residential Investment Corporation, a Delaware corporation. New Residential Investment Corporation is publicly traded on the New York Stock Exchange under the ticker symbol NRZ.

4.  Shellpoint is a licensed Maryland lender (license number 17710) and is also a licensed Maryland collection agency (license number 04-7989).

5.  This Court has jurisdiction for the claims herein because Shellpoint transacts business, performs work in, has an interest in real property, and provides services in Maryland and Anne Arundel County, Maryland and has therefore subjected itself to such jurisdiction. *See e.g. Pacific Mortg. and Inv. Group, Ltd. v. Horn*, 100 Md.App. 311, 324 (Md.App. 1994) (a person who "buys and sells [] mortgage liens has done more than merely transacted business…but has, in fact, carried on a regular business").

6.  This Court also has jurisdiction for the claims asserted because the injuries to Plaintiffs caused by the Defendant's collective action occurred in Maryland.

## SUMMARY OF CLAIMS

7.  This action is filed to enforce statutory provisions of remedial Federal laws and regulations governing the Houck Loan and the conduct of the Defendant related thereto—i.e. 12 U.S.C. § 2605 ("RESPA") as well as regulations promulgated by the Consumer Financial Protection Bureau (CFPB) and that became effective on January 10, 2014, specifically, 12 C.F.R. § 1024.1, *et seq.* ("Regulation X").

8.  In January 2013, the CFPB issued a number of final rules concerning mortgage markets in the United States, pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act (DFA), Public Law No. 111-203, 124 Stat. 1376 (2010).

9.  Specifically, on January 17, 2013, the CFPB issued the Real Estate Settlement Procedures Act Mortgage Servicing Final Rules, 78 Fed. Reg. 10695 (Regulation X) (February 14, 2013), which became effective on January 10, 2014.

10. Houck asserts claims for relief against Shellpoint for violations of the specific rules under RESPA and Regulation X, as set forth, *infra*.

11. Shellpoint is a mortgage servicer as defined by RESPA and Regulation X. 12 U.S.C. § 2605(i)(2); 12 C.F.R. § 1024.2(b).

12. The Houck Loan is a "federally related mortgage loan" as defined by RESPA and Regulation X. 12 U.S.C. § 2602(1); 12 C.F.R. § 1024.2(b).

13. The Houck Loan is not a "reverse mortgage transaction" as defined by RESPA and Regulation X. 12 C.F.R. § 1024.31; see 12 C.F.R. § 1026.33(a) (Regulation Z).

14. The Houck Loan is secured by the Houck Property which served as the Houck's principal

residence at the time the Parties agreed to the loan terms as discussed herein. 12 C.F.R. § 1024.30(c)(2).

15. Shellpoint is subject to the requirements of RESPA and Regulation X, and neither qualifies for the exception for "small servicers"—as defined by 12 C.F.R. § 1026.41(e)(4)—nor for the exemption for a "qualified lender"—as defined by 12 C.F.R. § 617.7000.

16. Mortgage servicers are prohibited from failing "to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties." 12 U.S.C. § 2605(k)(1)(C).

17. Mortgage servicers are prohibited from failing "to comply with any other obligation found by the [CFPB], by regulation, to be appropriate to carry out the consumer protection purposes of [RESPA]." 12 U.S.C. § 2605(k)(1)(E).

18. Plaintiffs have a private right action under RESPA and Regulation X pursuant to 12 U.S.C. § 2605(f) for the claimed violations and such action provides for remedies including actual damages, statutory damages, and attorneys' fees and costs. Plaintiffs have similar rights under the state law claims asserted herein.

19. As part of its license to conduct business in the State of Maryland, Shellpoint "has a duty of good faith and fair dealing in communications, transactions, and course of dealings with a borrower in connection with the advertisement, solicitation, making, servicing, purchase, or sale of any mortgage loan." Plaintiffs therefore also assert statutory claims for violations of the Maryland Code of Regulations § 09.03.06.20 since as shown herein Shellpoint has asserted rights which are inconsistent with its duties pursuant to §

09.03.06.20

20. All persons, including licensed mortgage lenders and servicers in the State of Maryland, like Shellpoint, are expected to know the law—including the laws governing their activities. As part of its license to conduct business in the State of Maryland, Shellpoint "has a duty of good faith and fair dealing in communications, transactions, and course of dealings with a borrower in connection with the advertisement, solicitation, making, servicing, purchase, or sale of any mortgage loan." Md. Code Regs. 09.03.06.20.

21. The Court of Appeals in 2005 recognized that a real estate professional who had no direct communication with a borrower nevertheless had a duty to the consumer under the Maryland Consumer Protection Act and Maryland common law to make a "reasonable investigation" of the true facts in the real estate transaction on which the borrower (and other parties) would rely in order to complete the transaction. *Hoffman v. Stamper*, 385 Md. 1, 867 A.2d 276 (2005). This duty of care applies to Defendant as its work involves secured, consumer mortgage loans subject to Maryland and Federal laws such as those discussed herein.

## **FACTUAL BACKGROUND**

22. On or about April 16, 2021, the Houcks executed a Note in the amount of $743,330 with non-party Intercap Leading, Inc. (the "Note") and a mortgage on the Houck Property purportedly securing the Note (the "Mortgage") (collectively, the "Loan"). *See*, a copy of the Loan documents, attached as **Exhibit 1**.

23. The Houcks are married with two children. Mr. Houck is serving this Country on active duty in the United States Marine Corps and Mrs. Houck is a veteran having served previously in the United States Air Force. Because of her service in the Air Force, Mrs.

Houck has access to certain VA benefits including those to qualify for a VA mortgage loan and also the Houck Loan.

24. Using the VA benefits, Plaintiffs acquired the Houck Property for their personal use, specifically, in order to reside in the Houck Property as their primary, principal residence and agreed to and replied upon the Houck Loan terms and the guidelines governing it which are expressly incorporated into its provisions.

25. As a result of the COVID-10 pandemic, the Houcks sustained a reduction of income and increased household expenses and entered into forbearance agreements with Shellpoint to forbear their monthly payments under the Loan from August 1, 2022 through April 20, 2023 and then again from September 1, 2023 through October 31, 2023. During the latter forbearance periods, the Houcks had been working with potential purchasers of the property (the "Purchasers") to assume the Houck Loan pursuant to VA guidelines governing it to relieve themselves of any further obligations as Mr. Houck had been transferred to California and purchased a property there.  Unlike other types of mortgage loans one of the common, standard servicing practices related to VA loans are that VA loans, like the Houck Loan, are assumable by other persons pursuant to the VA guidelines.

26. During the early steps of this process, Shellpoint, by email on June 1, 2023 and June 15, 2023, informed the Houcks that it had evaluated the Loan for an assumption based on the eligibility requirements of Shellpoint and that the Houcks were eligible to continue the assumption qualification process. The Houcks relied upon each of those specific representations by spending money to prepare to sell the Houck Property, incurring a realtor to sell the property, enter in an agreement to sell the Houck Property with the

Houck Loan being assumed, and as also discussed *infra*.

27. On or about May 22, 2023 the VA issued Circular 26-23-10 which stated: "The servicer must also ensure the loan is current or will be made current at or before the close of the assumption. It is permissible for the loan to be brought current through cash at close." *See*, VA Circular 26-23-10, attached as **Exhibit 2**. This standard servicer guideline which governed the Houck Loan allowed the Plaintiffs to sell their property and have the Houck Loan assumed by another through the proceeds at the time of settlement.

28. Further, the VA Servicer Handbook Chapter 5, § 6f states: "[t]o approve the transfer of ownership: the loan must be current or will be brought current at the closing of the sales transaction." *See*, VA Servicer Handbook at page 23-33, attached as **Exhibit 3**. This standard servicer guideline which governed the Houck Loan allowed the Plaintiffs to sell their property and have the Houck Loan assumed by another through the proceeds at the time of settlement.

29. Despite the foregoing standard servicer duties and guidelines governing the Houck Loan, and despite the fact that the forbearance status of the Houck Loan should not have had any effect on the ability of the Houcks and the purchasers to effectuate the assumption of the Loan, Shellpoint began to unfairly, deceptively, or falsely claim and represent that the Houcks were unable to proceed with the assumption process unless they remitted funds to fully cure any delinquency on the Loan prior to the assumption and closing of the sale transaction. In other words, instead of bringing the loan current at settlement of the property and simultaneous assignment of the loan to a purchaser, Shellpoint altered the actual standard governing the Houck Loan and demanded that the Houcks pay first before any settlement occurred or could be scheduled.

30. Upon information and belief, Shellpoint took the position it did in the previous paragraph because it is part of its practice to churn default related fees even when the standard servicer duties precluded it from doing so. *Cf. Yates v. NewRez LLC*, --- F.Supp.3d ----, No. CV TDC-21-3044, 2023 WL 5108803, at *1 (D. Md. Aug. 9, 2023)(reporting Shellpoint was previously found to have churned fees from Maryland borrowers without the right to do so).

31. On November 14, 2023, Mr. Houck submitted a complaint to the Consumer Financial Protection Bureau ("CFPB") complaining that he was having difficulties getting Shellpoint to follow through with the assumption pursuant to the standard servicer duties governing the Houck Loan.  CFPB complaint #1 attached hereto as **Exhibit 4.**

32. **Shellpoint's authorized representatives received a copy of** Mr. Houck's CFPB complaint described in the previous paragraph pursuant to the CFPB's standard policy and practice.

33. On November 17, 2023, the Defendant's authorized representative (Tzaddi Hunter) wrote via email to Mr. Houck stating that "I was able to confirm that we cannot approve an assumption without a loan modification." This was contrary to what Mr. Houck had previously been told by the VA (discussed *supra*) and also told by the Defendant as described *infra*.  In addition, this November 17, 2023 representation and statement was false and contrary to VA Circular 26-23-10 and the VA Servicer Handbook. See email dated November 17, 2023 attached hereto as **Exhibit 5; see also, Exhibits 2 and 3.**

34. In that November 17, 2023 email, Hunter further falsely represented that the Houcks could be reviewed "for an assumption without a modification if you bring the loan current with a full reinstatement." *Id.*  This statement was knowingly false since the

8

Plaintiffs were permitted under the standard servicer duties and guidelines governing the Houck Loan to sell the Houck Property and bring the loan current at the time of settlement.

35. At no point did Hunter inform the Houcks that the mortgage could be assumed without either bringing the mortgage current or by a loan modification by bringing the mortgage current with the sales proceeds at sale closing as stated by the VA in both Exhibits 2 and 3, *supra*. Instead, Shellpoint's authorized representative Hunter recklessly omitted disclosure of their standard service duty and practice to the Plaintiffs as part of Shellpoint's routine conduct with the Plaintiffs and similar borrowers.

36. Shellpoint responded to the CFPB complaint #1 on November 28, 2023 by letter stating: "As explained by our representatives, the loan would need to be current to be assumed without going through a modification. Our records indicate you declined the loan modification offer due to the potential rate change. The second option provided was to bring the loan current with the sale proceeds and then the assumption could be completed . . ." See Shellpoint November 28, 2023 response attached hereto as **Exhibit 6**.

37. The information in the response (*Id.*) regarding bringing the loan current with sale proceeds was in complete opposition to the information Mr. Houck had previously been provided by Shellpoint. In addition, this statement was knowingly false since the Plaintiffs were permitted under the standard servicer duties and guidelines governing the Houck Loan to sell the Houck Property and bring the loan current at the time of settlement through the use of the sale proceeds.

38. On or about December 8, 2023, the Houcks, through counsel, sent a request for information to Shellpoint via Certified Mail [Tracking No. 9589 0710 5270 0858 6159

72] ("RFI #1") at its address designated for borrowers to send a request for information pursuant to 12 C.F.R. § 1024.36 (the "Designated Address"). *See*, a copy of RFI #1, along with the Tracking Information for the same obtained from the USPS's website (www.usps.com), attached as **Exhibit 7**.

39. The Houcks requested in RFI #1, *inter alia*, that Shellpoint provide loan ownership information, and information concerning the master servicer and current servicer, in addition to requesting a payoff statement. *Id.*

40. Shellpoint received RFI #1 at the Designated Address on or before December 12, 2023. *Id.*

41. Additionally, on or about January 4, 2024, the Houcks, through counsel, sent a request for information to Shellpoint via Certified Mail [Tracking No. [9589 0710 5270 0858 6158 35] ("RFI #2") at its address designated for borrowers to send a request for information pursuant to 12 C.F.R. § 1024.36 (the "Designated Address"). *See*, copy of RFI #2, along with the Tracking Information for the same obtained from the USPS's website (www.usps.com), attached as **Exhibit 8**.

42. The Houcks requested, in RFI #2 *inter alia*, that Shellpoint provide a life of loan transaction history, servicing notes, broker price opinion (if any), a copy of the original note, the two most recent escrow analyses, reinstatement figures, dates of receipt of any incomplete loss mitigation packages, dates of receipt of any complete loss mitigation packages, copies of correspondence sent to the Houcks since January 10, 2014, copies of any trial period payment plans, loan modification agreements, or loss mitigation agreements otherwise, whether temporary or permanent, that were offered to the Houcks. *Id.*

43. Shellpoint received RFI #2 at the Designated Address on or before January 8, 2024. *Id.*

44. Shellpoint failed to send written notice acknowledging receipt of either RFI #'s 1 or 2 within five (5) days of receipt, excluding legal public holidays, Saturdays, and Sundays as required by 12 C.F.R. § 1024.36(c) and 12 U.S.C. § 2605(e)(1)(a).

45. Shellpoint failed to provide, as requested in RFI #1, an accurate payoff statement for the Loan within seven (7) business days of receipt as required by 12 C.F.R. § 1026.36(c)(3) and 15 U.S.C. § 1639g. *See also* Md. Code Regs. 09.03.06.14(A) ("Within 5 business days after written request by the borrower, a licensee shall provide the borrower or the borrower's designee with a written statement of the dollar figure which will repay a loan in full").

46. Shellpoint failed to respond to any of the additional requested information in RFI #1 within ten (10) days of receipt, excluding legal public holidays, Saturdays, and Sundays as required by 12 C.F.R. § 1024.36(d)(2)(i)(A) and 12 U.S.C. § 2605(k)(1)(D).

47. On or about December 14, 2023, Mr. Houck submitted a second complaint to the CFPB complaining that Shellpoint had incorrectly informed him in its November 28, 2023 response to CFPB complaint #1, it needed certain documents from the incorrect party (seller rather than buyer), and that it had further informed him it needed a VA form that did not exist – VA26-6832. CFPB complaint #2 attached hereto as **Exhibit 9.**

48. Additionally, Mr. Houck in CFPB complaint #2 stated that he was informed by an authorized representative of Defendant's (i.e. Charia Turner) that Houck could not do a modification for the loan to then be assumed. This was in complete opposite to what he was told on November 17, 2023 by email (Exhibit 5) and Shellpoint's response to CFPB complaint #1 (Exhibit 6). *Id.*

49. Shellpoint did, on or about January 11, 2024, respond to RFI's # 1&2 and CFPB complaint #2. In Shellpoint's response it admitted that it had in fact made an error and provided an incorrect form number (VA26-6832) in its response to CFPB complaint #1 and had sent an apology letter dated December 14, 2023 to the Houcks' former counsel stating that the correct form is VA26-6382. See **Exhibit 10.**

50. Shellpoint's January 11, 2024 response did not respond to or address in any manner or substantive form, Mr. Houck's complaint that he was receiving conflicting and materially false information about the assumption process and conflict with VA servicing guidelines. *Id.* Such misstatements and omissions are also barred by Maryland law. REAL PROP. 7-401, *et sec.*

51. On or about January 30, 2023, the Houcks, through counsel, sent a notice of error and request for information to Shellpoint via Certified Mail [Tracking No. 9589 0710 5270 0741 2156 61] ("NOE #1") at its address designated for borrowers to send a notice of error and request for information pursuant to 12 C.F.R. § 1024.35(b)(11),12 U.S.C. § 2605(e), 12 C.F.R. § 1024.36, and 12 U.S.C. § 2605(e). *See,* a copy of NOE #1, along with the Tracking Information for the same obtained from the USPS's website (www.usps.com), attached as **Exhibit 11**.

52. NOE #1 stated:

> During the early steps of this process, both the Department of Veterans Affairs (VA) and Shellpoint informed the Borrowers that they would be able to effectuate the assumption of the Loan while in forbearance or delinquent so long as the Borrowers would have sufficient funds upon the closing of the transaction from the proceeds of the transaction to bring the Loan fully current.
>
> Despite the foregoing, and despite the fact that the forbearance status of the Loan should not have had any effect on the ability of the Borrowers and the Purchasers to effectuate the assumption of the Loan, Shellpoint began to falsely claim that the Borrowers were unable to proceed with the assumption process unless they

remitted funds to fully cure any delinquency on the Loan prior to the assumption and closing of the sale transaction.

Moreover, upon information and belief, Shellpoint not only made these misrepresentations to the Borrowers, but also the Purchasers. These misrepresentations have severely and unnecessarily complicated and delayed the assumption of the Loan and caused unnecessary financial hardship and harm to the Borrowers in the form of continued principal and interest payments for which they have become liable and for attorneys' fees to unwind the complications that arose from the unwarranted misrepresentations from Shellpoint.

Shellpoint's actions, in making misrepresentations as to the assumption process for the Borrowers' Loan to both the Borrowers and third parties, including the Purchasers, or in otherwise misleading the Borrowers and Purchasers as to the assumption process constitutes multiple errors in the servicing of the Loan pursuant to 12 C.F.R. § 1024.35(b)(11) and otherwise pursuant to 12 U.S.C. § 2605(e), one (1) such error for each misrepresentation Shellpoint made as to the same.

*Id.*

53. NOE #1 further requested:

1. Copies of any and all servicing notes related to the servicing of the above-referenced mortgage loan during the time Shellpoint, or any related company of Shellpoint, has serviced the Loan from August 1, 2023 to the present;

2. A copy of any communications, recordings of conversations, or communications logs concerning the assumption process related to the Loan including, any disputes regarding the same between Shellpoint, or any related company of Shellpoint, and the Borrowers, the Purchasers, or the VA since August 1, 2023.

3. A copy of any written correspondence between Shellpoint and the Borrowers, the Purchasers, or the VA concerning the assumption process for the Loan, or any disputes regarding the same, related to the Loan including, since August 1, 2023.

4. Specifically identify any VA servicing guidelines, manuals, mortgagee letters, or other similar such documents that indicate that a borrower must bring any delinquency or forborne payments current prior to an assumption or otherwise prohibiting a borrower from utilizing settlement funds from the closing of a sale to bring such amounts current prior to a loan being assumed.

5. Any documentation upon which Shellpoint relies upon in responding to the errors alleged, *supra*.

54. Shellpoint received NOE #1 at the Designated Address on or before February 2, 2024. *Id.*

55. Shellpoint responded on February 7, 2024 but did not in any manner or substance reply to the error raised in NOE #1 or provide any of the requested information or state that none existed. A copy of the February 7, 2024 response is attached hereto as **Exhibit 12.**

56. As of the filing of this action, Shellpoint had still not addressed or corrected the errors alleged by and through NOE #1.

57. On March 13, 2024, Mr. Houck emailed Defendant stating that he and the purchasers had again been provided factually incorrect information by Shellpoint.   Specifically, Mr. Houck stated:

> Tiffany & Assumptions,
>
> I was informed from customer service today that you were in email communication with our buyer/assumer on 03/08/2024 regarding the status of the assumption. I was also informed that your office notified the buyer/assumer that we (seller/borrower) had not sent in our TPA granting the buyer/assumer access. Attached below is proof that I sent you the requested/required TPA on 02/23/2024 as a reply to your email to me on 02/22/2024. Why was that TPA not filed?
>
> Furthermore, why are you taking time to respond to the buyer/assumer on 03/08/2024?I have sent your office numerous emails since 02/23/2024 asking for confirmation of receipt and status updates regarding the assumption and have received no reply from your office.
>
> Why will you reply to the assumer but you will not reply to your customer and borrower?
>
> Your actions and inactions only serve to extend my families hardship.
>
> What is the status of the assumption? Do you have all required documents from the assumers? I request/demand a email confirmation from your office regarding the TPA by COB Friday 03/15/2024.

*See* Email chain attached as **Exhibit 13.**

58. In response, rather than respond to Mr. Houck's questions, Shellpoint on March 18, 2024 simply responded that it had received information that the buyers were not moving

forward, the loan was over a year past due, and the seller (Plaintiffs) did not want to move forward.

59. This is completely inaccurate as the Plaintiffs have been attempting to consummate the sale and assumption since at least October of 2023 and never stated they did not intend to proceed with any sale of the Houck Property and assumption of the Houck Loan.

### IMPACT UPON AND DAMAGES SUFFERED BY THE HOUCKS

60. Shellpoint repeatedly provided and continues to provide incorrect, inconsistent, and diametrically opposed information to the Houcks and has to this day failed or refused to correct the errors alleged through NOE #1 in a timely manner in addition to failing to timely respond to the Houcks' request for information. Shellpoint's reckless and false communications also omit facts, practices, and standard servicer duties known to them which they conceal from their disclosures to the Plaintiffs and Shellpoint knows do not support its changing contentions.

61. Had Shellpoint provided the Houcks with correct information and properly responded to the errors alleged through NOE #1 the Houcks' damages would have been mitigated significantly and they would have been able to sell the residence and satisfy their obligations on the Houck Loan.  Rather, Shellpoint's acts and omissions negatively impacted and infected the Houcks' agreements to sell the property and have the Houck Loan assumed by another all while Shellpoint continues to impose and churn fees onto the account which it would not have realized if it had in fact followed the standard servicer duties and guidelines governing the Houck Loan.

62. Shellpoint's improper actions caused the Houcks to suffer from actual damages including, but not limited to:

a.  Additional interest, fees and charges, including, but not limited to late fees, imposed on the Loan since Shellpoint wrongfully caused delay in the Houcks being able to sell the Houck Property and satisfy the Houck Loan that would not have been incurred and for which the Houcks would not have become responsible but for Shellpoint's wrongful conduct;

b.  Legal fees, costs, and expenses in the amount of $7,500.00 to retain Heise & Heise, a non-litigation attorney the Houcks hired to get the transaction and assumption process back on track during November 2023 until late January 2024;

c.  Legal fees, costs, and expenses to submit each of the RFIs and the NOE in a good faith attempt to amicably resolve this matter or to have Shellpoint mitigate the harm caused to the Houcks to which the Houcks did not receive a proper or adequate response;

d.  Credit damage and reputational harm, and an exacerbation of any existing credit damage, due to the unnecessary delay which was and continues to be reported to various credit reporting agencies, as well as a delay in the rehabilitation of such harm which has limited their ability to obtain credit or otherwise deterred them from seeking various forms of credit;

e.  A delay in being able to access liquid funds from the sale of the Houck Property and the assumption of the Loan which caused the Houcks to need to borrow $25,000.00 to help with their family's living expenses;

f.  Loss of Mr. Houck's security clearance due to the financial distress and impact to his credit and damage to reputation caused by Shellpoint's acts and omissions by failing to follow the standard servicer duties governing the Houck Loan.

g. Due to the conduct of Shellpoint, the Houcks have had to max out credit cards at significant levels of interest, request financial assistance from family members, and delay payment of tax and medical payment obligations to be able to cover basic needs and living expenses;

h. Mr. Houck has suffered from severe emotional distress with physical impact driven by these wrongful acts and omissions and by justified fear that such would lead to the foreclosure sale of the Houck Property, his family's previous home, which resulted in frustration, loss of sleep, anxiety, depression, embarrassment, and other significant emotional distress including the threat of legal action by the buyers of the Houck Property whom currently reside in the Houck Property and refuse to pay rent.

i. Additionally, Shellpoint's actions acts and omissions have caused Mr. and Mrs. Houck to frequently argue, and has caused spousal alienation, which coupled with Mr. Houck now having to work two (or more at times) jobs, has resulted in a complete lack of physical and romantic relationship;

j. Mr. Houck has had to obtain additional employment to supplement his income to cover legal bills and defaulting debt which has caused severe emotional distress, frustration, anxiety, and loss of sleep due to having to work more hours and be away from his family who in turn suffer from his absence;

k. The financial and emotional strain caused by the conduct of Shellpoint has led to a reduction in the Houck children's standard of living and to instability in the household as Mr. Houck only sees his children and couple hours a day due to his increased work hours. Mr. Houck's father – who he was very close with - has also distanced himself from Mr. Houck and avoids his telephone calls;

l.  Prior to obtaining additional income, Mr. Houck had to seek charitable financial support to provide for his family which has caused stressed, embarrassment, humiliation, and damage to his reputation in the community; and,

m.  Mr. Houck has sought counseling to help cope with the emotional distress and impact on his life this situation has caused. He has additionally sought medical help as he has gained thirty-five (35) pounds (which caused him to be out of compliance with the USMC height and weight standards), has nightmares, and cannot sleep more than a few hours before waking and worrying about his family's financial security and future;

n.  Mrs. Houck has suffered from severe emotional distress with physical impact driven by these wrongful acts and omissions and by justified fear that such would lead to the foreclosure sale of the Houck Property, which resulted in frustration, loss of sleep, anxiety, and depression.  The financial and emotional strain caused by the conduct of Shellpoint has led to exacerbation of Mrs. Houck's diagnosed PTSD for which she receives 30% disability from the VA which causes her to have panic attacks and near-nightly nightmares.  Mrs. Houck would like to seek counseling but because of a lack of childcare and Mr. Houck's absence from the home has been unable to do so;

## PATTERN AND PRACTICE OF REGULATION X VIOLATIONS BY SHELLPOINT

63. Shellpoint's actions are part of a pattern and practice of behavior in violation of the Houck's rights and in abdication and contravention of Shellpoint's obligations under the mortgage servicing regulations set forth in Regulation X of RESPA.

64. As of the filing of this Complaint, consumers nationwide have lodged over five thousand consumer complaints with the CFPB against Shellpoint, and six hundred and forty

specifically identified on the CFPB's consumer complaint database related to servicemembers mortgages. Each such complaint is filed and cataloged in the CFPB's publicly accessible online database which can be accessed at: http://www.consumerfinance.gov/data-research/consumer-complaints.

65.     Houck has reviewed the CFPB's consumer complaint database and have identified narratives asserting that Shellpoint failed to abided by its standard servicer duties in dealing with other borrowers. In particular, Houck has reviewed the ten (10) consumer complaints attached hereto (nine of which are lodged by servicemembers and in all ten Shellpoint provided relief to the borrower because of its mortgage servicing mistakes) and identified as **Composite Exhibit 14**. The date, details, and a narrative disclosed by the consumer is set forth in each complaint. The complaints show conduct which demonstrates that Shellpoint has engaged in a pattern or practice of violating RESPA with respect to other borrowers.

66. Additionally, this is not the first time Shellpoint has been sued and agreed to a settlement in this Court for violations of RESPA. Specifically, on August 20, 2021, this Court entered a Final Judgment Order approving a class settlement with Shellpoint and Fannie Mae for charging borrowers illegal convenience fees in order to make payments towards their residential mortgage when the fee was not specifically set out in the original agreement creating the debt which was a violation of a standard servicer duty to service a mortgage loan pursuant to the terms of the loan documents. See, *White v. Shellpoint and Fannie Mae*, Case No. C-02-CV-001060.

**COUNT ONE:**
**VIOLATIONS OF 12 C.F.R. §§ 1024.35, 1024.36 AND 12 U.S.C. §§ 2605(e) AND (k)**
**(Failure to properly respond to RFIs and NOE and complaints)**

67. The Houcks restate and incorporate all of the statements and allegations contained in paragraphs 1 through 66 in their entirety, as if fully rewritten herein.

68. Mr. and Mrs. Houck are each a "borrower" entitled to the protections codified at 12 U.S.C. § 2605 and Regulation X.

69. Shellpoint is a mortgage servicer subject to the mandatory requirements of 12 U.S.C. § 2605 and Regulation X in relation to the Houcks.

70. Pursuant to 12 U.S.C. § 2605(k)(1)(E), Shellpoint had a legal duty to timely "to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter." As discussed herein, Shellpoint did not comply with multiple CFPB regulations.

71. Shellpoint had duty of care under 12 U.S.C. § 2605(e)(1)(a) and12 C.F.R. § 1024.36(c) to acknowledge in writing Houck's RFIs within five (5) business days which it failed to do.

72. Shellpoint had duty of care under 12 U.S.C. § 2605, 12 C.F.R. § 1024.36(c)(3), and 15 U.S.C. § 1639g to provide, as requested in RFI #1, an accurate payoff statement for the Loan within seven (7) business days of receipt, which it failed to do.

73. Such failure was also a violation of Md. Code Regs. 09.03.06.14(A) which requires that within five (5) business days after written request by the borrower, a licensee shall provide the borrower or the borrower's designee with a written statement of the dollar figure which will repay a loan in full.

74. Shellpoint had duty of care under 12 U.S.C. § 2605, 12 C.F.R. § 1024.36(d)(2)(i)(A) to respond to any of the additional requested information in RFI #1 within ten (10) days of receipt, which it failed to do.

75. Shellpoint did not materially respond or reasonably investigate numerous of the Plaintiffs' NOEs identified in the preceding paragraphs and therefore violated 12 U.S.C. §§ 2605(e), 2605(k)(1)(C), 2605(k)(1)(E).

76. A servicer must respond to a notice of error by either:

    (A)   Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or

    (B)   Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

    12 C.F.R. § 1024.35(e)(1)(i); *see also* 12 U.S.C. § 2605(e)(2)(B).

77. Shellpoint had duty of care under 12 C.F.R. § 1024.35 to conduct a reasonable investigation of Plaintiffs' NOEs but failed to do so since it failed to do any reasonable investigation as demonstrated herein.

78. "A servicer of a federally related mortgage shall not...fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties." 12 U.S.C. § 2605(k)(1)(C).

79. The NOEs constitute a notice of error as defined by 12 C.F.R. § 1024.35(a) as it is a "written notice from the borrower that asserts an error and that includes the name of the

borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred." *See*, Exhibit 11.

80. Shellpoint did not fulfill its obligations as to 12 C.F.R. § 1024.35(e)(1)(i)(A) through its response to the NOE as despite admitting that it erred in providing an incorrect VA form number as alleged, it failed to correct or address any of the other asserted errors and address the conflicting information it had provided to Houck. *See*, Exhibit 12.

81. Rather than addressing the conflicting and materially incomplete information the Houcks received from its authorized representatives and providing the additionally requested documents, Shellpoint simply claimed it had previously addressed the asserted errors and provided its prior non-responsive January 11, 2024 communication and denied having committed any error. See, Exhibit 12.

82. Shellpoint's failure to properly and completely respond to the NOEs and failing to correct its errors or to otherwise perform a reasonable investigation into and otherwise properly respond to the errors alleged through the NOE constitute violations of 12 C.F.R. § 1024.35(e) and 12 U.S.C. § 2605(k) and caused the Houcks to suffer actual damages, as discussed, supra, including, but not limited to significant credit harm and unwarranted financial and emotional distress. See *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1246 (11th Cir. 2016) ("This statutory mechanism makes past errors current by requiring servicers to fix errors they find upon reasonable investigation . . )

83. Further, Shellpoint's failures to comply with 12 C.F.R. §§ 1024.35(e), 1024.36(c), and 12 U.S.C. § 2605(k) caused the Houcks to incur attorneys' fees and costs associated with the preparation of the RFIs and NOEs to metamorphose into damages.

84. Shellpoint's actions are part of a pattern and practice of behavior in conscious disregard for Houck's rights and in abdication of Shellpoint's obligations under RESPA and Regulation X.

85. As a result of Shellpoint's actions, Shellpoint is liable to Houck for actual damages and statutory damages, as further described, *supra*. 12 U.S.C. § 2605(f)(1).

86. Additionally, Houck requests reasonable attorneys' fees and costs incurred in filing and maintaining this action. 12 U.S.C. § 2605(f)(3).

## COUNT TWO: VIOLATIONS OF MARYLAND'S CONSUMER PROTECTION ACT, COM. LAW § 13-101, *ET SEQ.*

87. The Houcks restate and incorporate all of the statements and allegations contained in paragraphs 1 through 86 in their entirety, as if fully rewritten herein.

88. The mortgage loan servicing and collection practices described herein by Shellpoint, as set forth herein, are governed by the Maryland Consumer Protection Act ("MCPA"), COM. LAW. § 13-101, *et seq*.

89. Com. Law. § 13-303 prohibits unfair or deceptive trade practices in the extension of consumer credit or collection of consumer debts and further prohibits unfair or deceptive trade practices in the sale or provision of consumer services, such as those provided by Shellpoint in relation to Houck.

90. The MCPA defines unfair or deceptive trade practices to include, inter alia, the following: (a) False, falsely disparaging, or misleading oral or written statement, visual description or other representation of any kind which has the capacity, tendency or effect of deceiving or misleading consumers; and (b) Failure to state a material fact if the failure

deceives or tends to deceive.  Com. Law §§13-301(1) and (3).  The Plaintiffs do not assert any claims herein pursuant to Com. Law §13-301(9).

91. Shellpoint's acts and omissions described herein include but are not limited to falsely claiming that the Houcks were unable to proceed with the assumption process unless they remitted funds to fully cure any delinquency on the Loan prior to the assumption and closing of the sale transaction, falsely claiming that Shellpoint could not approve an assumption without a loan modification, requesting incorrect forms or forms from the incorrect party, and otherwise misleading Houck and the purchasers as to the assumption process constitutes unfair and deceptive trade practices in violation of Com. Law §§ 13-301(1) and (3) and Com. Law §§13-303(1) and (4).

92. The Houcks reasonably relied upon the direct and indirect material acts, actions, and omissions of Shellpoint as set forth *supra* and further demonstrated by their continued attempted communications with Shellpoint to verify and obtain the correct information, options, and procedures to move forward with the assumption.  Shellpoint's acts and omissions were simply unreasonable, unfair, abusive, and deceptive.

93. Had Shellpoint not acted unfairly and deceptively, the Houcks would not have suffered the damages and losses they have described *supra*.

94. Plaintiffs have pled sufficient facts to put Shellpoint on notice as to the claims exemplified *supra* (i.e. dates of key acts and representations of Shellpoint and its agents and representatives; and the regulatory and statutory duties of Shellpoint) which it simply ignored and thereby infected the subject transactions to ensure harm and damage to Houck.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs William Reid Houck and Vanessa Sandra Houck pray that this Court grant judgment against Defendant NewRez LLC d/b/a Shellpoint Mortgage Servicing and award them the following:

A. Actual damages from Defendant in an amount to be determined at trial for the allegations contained in Counts One in excess of $75,000.00;

B. Statutory damages from Defendant to each Plaintiff in the amount of Two Thousand Dollars ($2,000.00) for each of its violations of RESPA contained in Count One;

C. Attorney fees and costs for Defendants violations of RESPA contained in Count One;

D. Pursuant to Count Two of this Complaint, find Shellpoint in violation of the MCPA and award (i) actual damages for its violations of Com. Law § 13-301(1) and (3), Com. Law §§13-303(1) pursuant to Com. Law § 13-408(a) and (ii) reasonable attorney fees and reasonable costs as permitted and authorized by Com. Law § 13-408(b) in a total sum in excess of $75,000.00; and

E. Provide such other or further relief as the Court deems fair and appropriate.

Respectfully submitted,

*/s/ Phillip Robinson*

Phillip R. Robinson
Client Protection No. 0006210356
Consumer Law Center LLC
10125 Colesville Road, Suite 378
Silver Spring, MD 20901
(301) 448-1304
phillip@marylandconsumer.com

## RULE 20-201 CERTIFICATION

I hereby certify that this filing does not contain any restricted information.

/s/ Phillip R. Robinson
Phillip R. Robinson

## JURY DEMAND

Plaintiffs request a jury trial on all claims asserted herein.

/s/ Phillip R. Robinson
Phillip R. Robinson